Good morning, Your Honors, and may it please the Court, my name is Andrew Greenlee and I represent Kenyon Walton. Your Honors, the principles articulated in Rodriguez v. United States require that this court reverse the decision denying Mr. Walton's motion to suppress. Your Honors, under Rodriguez there is no such thing as a de minimis detention. Once the officer issues a warning citation, unless he has reasonable suspicion, he cannot detain the occupants of a vehicle any further. And we know from McVicker's testimony... You know, it seems to me he acted in a perfectly reasonable fashion. There were suspicious circumstances like, was it Smoot, the woman? You know, being very, very nervous even after he told her he was just gonna write a warning for her. Your Honor, obviously we dispute the fact that she was nervous. Nervousness standing alone is a very weak indicator. This Court recognized that in Huff v. Reichert. No, of course you can be nervous in the presence of the police, but not when they tell you they're just gonna write you a warning. Then you're relieved, right? You don't get a ticket. So why would you be upset? As you say, be relieved once the police officer tells you that. I don't think it it's the presence of the officer itself that makes you nervous. Once the officer says something nice to you, like I'm not gonna give you a ticket, I don't understand why you'd be nervous. Well, it's the presence of the officer. I don't know, it's a friendly officer. Since I like you, I'm not gonna give you a ticket. The officer takes you into his police car. He's interrogating you. It makes you nervous. The presence of officers standing alone makes you nervous. And he, but this nervousness was observed after he told her he was just gonna give her a warning. Right, and even if you credit the testimony, which we think it's not, you shouldn't credit it, because based on the actual, the video itself, if you look at her comportment in the actual, on the dash cam video, she's not nervous. She's joking with the officer. She says, I want to be a nurse. She's laughing. It just, it does not show that she's nervous, and we know from the that if there's a conflict between what's shown in the video and the actual officer's testimony, then it should be the video that wins out. And we think, and I would just ask the court to watch the video. The video tells the true story of what happened, and what happened was Miss Smoot was acting completely normal in the context of a traffic stop. The officer claimed, in my view, it's not credible, but he claims that there were extreme signs of nervousness. There was nothing extreme in her comportment. And we know from McVicker's testimony that... And what he observed, he said it was heavy breathing on her part, and her heartbeat that was visible. Right, and the video doesn't reflect either of those things. I've watched the video repeatedly. It doesn't reflect, it doesn't show it. He's just, in my view, just making that up, testifying to something in court to try to get the court to affirm his conviction. Well, the video doesn't necessarily reveal exactly the same things that you see, right? Well, it might not reveal everything, but I think that you can look at the video, and I would urge the court, again, to look at the video, and it will show that Miss Smoot was not nervous. She was telling jokes. She was behaving in an entirely, in a manner that's consistent with anyone who's in the presence of the court. Also, what difference would it make, you say he should have called the canine unit immediately. Well, the outcome would have been the same. The dog would have found the drugs, so how would that help her? I mean, help him, help Walton. How would it help Mr. Walton? Well, the touchdown is reasonableness, and this is more with respect to our second argument. But you said if he was suspicious, if the officer was suspicious, he should have called the canine unit earlier. That's right. But that wouldn't have helped Walton. Well, the only authority that the officer had to continue to detain Mr. Walton was Miss Smoot, and her reported nervousness, and the circumstances of the stop. So once Miss Smoot, once he's resolved the traffic stop with respect to Miss Smoot, and completed the mission of the traffic stop, then he would have to have reasonable suspicion to continue it, right? And we know under Sharpe that he has to diligently pursue the investigation. So when he goes, and he wastes 14 minutes talking about the same questions that he already had hashed out with them, when he searches her bag, she's already told him, by the way, that she has an urgent need to urinate. So it's simply not reasonable. That's the point of the second argument, is that it's just not reasonable to, once you have reasonable suspicion, even if you think it was improper for him to call the canine unit? Yes, I think it was improper. And it would have been improper even if he'd done it earlier, you're saying? No, the second argument is an argument in the alternative. So even if we lose our first argument, which respectfully our position obviously is that we shouldn't, but even if we lose that, we can still win if he's not diligently pursuing his investigation in a reasonable manner. The reason why we say that he was not, is that if indeed he had reasonable suspicion, as he didn't even claim that, he said he was building reasonable suspicion, which the natural inference from that is that he didn't have it in the first place, but even if he did, he should have called the the drug dogs right then and there, okay? What difference does it make whether he calls them earlier or later? What made a difference to her? She had to relieve herself. So assuming the drug dogs were called, it would have made a 14-minute difference in between when she could relieve herself. So what? I don't understand. It doesn't bear on guilt or innocence. Well, it doesn't have to. It's reasonableness, not guilt or innocence. I don't get it. Well, Your Honor, I'm trying to explain, and the point is she had to use the bathroom. It's unreasonable. You seem to assume he had enough reasonable suspicion to call the canine unit, and you're just complaining that he didn't call it as early as he should have. And that's a valid complaint. No, it's not a valid complaint. It most definitely is, Your Honor. It doesn't make any sense. It makes plenty of sense. You can't delay indefinitely. What difference does it make? There's a delay. So let her bring a suit for anxiety caused by delay in calling the canine unit. Why do you let this guy out of, you know, his massive drug liability just because the officer could have called the canine unit earlier? It seems totally disproportionate. Your Honor, I don't think I'm going to convince you on the second point, so I'd like to return to the first point. Okay. And if we could talk about the different bases for reasonable suspicion. First, there is the travel plans. I think we can eliminate this altogether because there was nothing convoluted or implausible about the travel plans. Ms. Smoot, her car broke down, her boyfriend flew into Denver, drove her back to Cincinnati. There's nothing convoluted. There's nothing plausible about that. We can eliminate the travel plans altogether as a basis for reasonable suspicion. The same thing with the lack of luggage. He said, oh, well, there was a lack of luggage. She had luggage. She had an overnight bag. Now, Walton rented the car and he had a suspended license, right? Yes, ma'am. That was one thing. Well, first of all, the suspended license, that was disputed below. This evidence in the first appeal found essentially that the evidence was an equipoise as whether he had a license or whether he did not. An additional point on that is it's not as if the car was stolen, right? He had an agreement with Dollar Rent-A-Car. If he breached the agreement, then that's a breach of contract. There's no suggestion in the record, either the testimony of a criminal enterprise or that it was indicative of criminal activity. The third point, McVicker himself said he didn't care three times in the third minute. I don't care. I could care less. He also said, look, you can cure that just by paying $5 and putting her on the rental contract. If he didn't care, why should this court? With regard to the Kansas stop, look, any inconsistency is easily reconcilable. He thought it was a search. She didn't think it was a search. It is a search, at least to the layperson. Your Honor, I'd like to reserve the remainder of my time. Okay. Thank you. Thank you, Mr. Greenlee. Mr. Boykin. May it please the court. My name is Alex Boykin. I'm with the Southern and I would also like to note that I wasn't the attorney below, but I'm familiar with the facts of the case to to speak to the factors and just to hit on what the district court found in this case. As far as reasonable suspicion is concerned, there are 10 things, 10 bullet points. Basically, um, trooper McVicker observed a large vehicle without a state plates in a known drug interdiction area. He witnessed Ms. Smoot in a stiff posture while she was driving before he pulled her over, while simultaneously observing traffic violations. And the next... I was puzzled that a police officer would stop someone for driving 68 miles per hour in a 65 mile an hour zone. Seems like a trivial violation. Well, that's just one of the three violations, but an officer can stop someone. No, I know he can, but you say there were other reasons for stopping him? Yes, Your Honor. Following too close. Oh, sorry. Following too close. Yes, Your Honor. And also, it appeared whenever he looked into the SUV as it was driving by that Mr. Walton did not have a seat belt on. And they're not really contesting that stop, right? Not that I'm aware of, Your Honor. And so you go to the next points, which are about the vehicle itself. It was rented, although neither of the passengers or neither of the people inside the vehicle were at liberty to drive it. Ms. Smoot was not an actual approved driver for the vehicle, and Mr. Walton had a suspended license. And then you get to the Kansas stop, which was also brought up almost from the very beginning. And Mr. Walton said that the Kansas stop lasted two hours, and he said that the car was searched. And then whenever Trooper McVicker brings Ms. Smoot back to the vehicle, his trooper car, and speaks with her, she says that the stop did not last for two hours. And furthermore, she also says that the vehicle was not searched during the time. Now, she was prosecuted, wasn't she? Yes, Your Honor. Has that been resolved? She pled guilty. She's sentenced? Yes. I don't have it with me at this moment. I'm just curious. It's not important. And so then after the Kansas stop, Mr. McVicker was informed, or Trooper McVicker was informed, that Smoot's vehicle had broken down for a multi-day trip to Colorado. And Mr. Walton flew one way to Colorado from Cincinnati to pick her up and bring her back from Golden, Colorado to Cincinnati. But the problem with that is that there was one piece of luggage in the vehicle. And later it's searched, and there's one change of clothes. That's Ms. Smoot's bag for a multi-day trip to Colorado. So being unclean in your garments is a suspicious thing? Well, it just doesn't jive with a multi-day trip. All I said is a suspicious thing. You're not carrying enough clothes. Yes, Your Honor. I would say so in this case. There are people across this country with only one suit. I only had one suit at one point. Do you carry any extra stuff with you from where you came from? From Illinois to Chicago. I mean, sorry, Southern Illinois to the Northern District. Yes, I packed. But I want to know, do you really think that the amount of luggage that somebody's carrying is suspicious for a stop? It's a 24-hour trip to Colorado, several days there, and then a stop back. So it does seem... Maybe it's wash and run, rinse and wear, you know, wash and wear. You can buy a shirt that you can throw it on, put it back on as soon as it dries. Would that be suspicious? It is, but the thing that's important as well is that it's in the context of everything else. So... But why? Sorry. What context could conceivably make the amount of closure requiring important? Well, it's the totality of the circumstances. So you look at the other factors involved in the case and something seemingly innocent... I said, what were they? Sorry? What were they? So I was getting to some more... Did you have deodorant with her or anything? Well, I'm not sure about that. It's an important issue if you're talking about how many clothes she has. So that's just one of the factors and you have to look at the totality of the circumstances. Because under FINK, it says that things that are seemingly innocent could actually come together to be indicative of criminality. And one of the things is a change of clothes. Another thing is the Kansas stop. The drug interdiction area itself, a large vehicle with many voids in it, used to hide drugs. It seems to me when you throw in things like there's not enough clothes, you're diminishing the real issue. Was there sufficient evidence to pull them over and assert? Why throw in funny things like that? She steered when I asked her a question. She broke into a cold giggle or something. What about Mr. Greenlee's point that the video doesn't show any nervousness? Well, the district court looked at the video and determined that there was nervousness by looking at that. And so it's actually under a clear error standard at this juncture because it's a fact-finding mission. And I would say that if you actually do look at the video, you can see kind of her heart beating out of her chest a little bit. We will. You can see her heart beating out of her chest? Not physically out of the skin, but you can see it kind of beating. I hope it's beating. Kind of at an increased rate. Your heart beating is also an indication of guilt. Well, and then the other thing is she actually admits that she's agitated. She admits what? She admits that she's agitated on two different occasions. Listen, if I got pulled over by a couple of cops in the middle of nowhere, I'd be agitated too. But so you'd have to admit it. Well, there was a stop in Kansas and a stop in Illinois. So it was two separate. And on top of that, later on you learn of the appellant's criminal history. And that includes a drug trafficking conviction. That occurred before the dog search? That occurred before. Yes, Your Honor. And so you take all of that stuff together and it lays a pretty firm groundwork for reasonable suspicion. So then you move to the extended stop. And during the extended stop, Trooper McVicker speaks with Ms. Fishen to extend the stop and ask her a few questions. Two of which were whether there were drugs and illegal weapons in the car. And then another one specifically whether there's cocaine in the car. And both times she looks back to the vehicle and that didn't occur at any other time whenever he was asking her other questions. So it seemed to indicate again that there was something illegal in the car. And then he asks, after detailing the reasonable suspicion, he asks if he can search the vehicle. And Ms. Smoot kind of says, well, I don't know if I'm actually qualified or, you know, if I can actually give permission because I didn't rent the vehicle. And so he asks her again because he wants her permission and Mr. Walton's. And she says, you know, ask Mr. Walton. But she does agree to allow her back to be searched. So then Trooper McVicker speaks with Mr. Walton and he says no to the search. But he does have something. He has the bag to look into. So and there could be something in there as well. So he looks at the bag. After he finds that he cannot search the car and there's nothing in the bag, at that point, he calls the dog. And at that point, it's about. So when does he get their criminal history? That's before he calls on the dog, right? Yes, Your Honor. That's at about the 19 minute mark. The call to the K-9 unit is about 33 minutes and 35 seconds into the traffic stop and the pullover. And with that, I'll rest if no one has any questions. Okay. Thank you, Mr. Boyd. Thank you, Your Honor. Your Honors, with respect to the rental of a Suburban, there's nothing suspicious about the rental of a Suburban. It's not a Bentley. It's not what he said. McVicker said that it's an extreme luxury upgrade. It's not. It's a Suburban. There's nothing suspicious about renting a Suburban. With regard to the posture, it's boilerplate for this cop. He testified in a similar proceeding in front of the same judge in this court, and this court reversed his testimony. They used the same phraseology, stiff and rigid posture. And how can he even tell whether it's stiff and rigid when the car, he's in the median, and the car is going by at 68 miles per hour? Not believable. With respect to the dog sniff in Kansas, what are the odds that he has two constitutional violations in two nights? How many dog sniffs have Your Honors been subjected to? Twice in two nights? None. None. Speak for the panel. So, two constitutional violations in two nights. What are the odds? Of course, she's agitated. I would be too. With regard to the overnight luggage, it's a duffel bag, right? That's as much as could be expected. Her other bags were likely in her car in Colorado. And with regard to the other things, look, they were after the issuance of the warning ticket. He learned about the criminal history after the warning ticket was issued. Not relevant as to reasonable suspicion. The same with him looking back in the investigation. So, if Your Honors, there's no further questions, we'd ask the court to reverse. Thank you. Thank you very much. Were you appointed, Mr. Freeman? No, sir. No. Thank you anyway. Thank you, Your Honors. I would like to underscore the implications of Judge Bower's important reference to wash and wear. Yes. If all travelers simply had their one wash and wear garment, the amount of gasoline consumed by vehicles would be greatly reduced. There would be enormous savings. We'd all be better off for it, Your Honor. I like that suggestion. My wife wouldn't like it as much. I hope that will be considered in Ms. Smoot's sentencing, right? I don't think that that was a mitigator that was considered, but I wasn't present for Ms. Smoot's sentencing, Your Honor. I trust that Judge Reagan took that into account, though. Well, thank you. Thank you very much. Thank you.